**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

STEPHEN L. GOEWEY, a minor, by his
next friend; JULIE A. GOEWEY; KEVIN
D. GOEWEY, both as individuals and
as parents of Stephen L. Goewey,
<u>Plaintiffs-Appellants,</u>

v.

UNITED STATES OF AMERICA; FLUOR                    No. 95-2257
DANIEL, INCORPORATED; FD SERVICES,
INCORPORATED,
<u>Defendants-Appellees,</u>

and

VELSICOL CHEMICAL CORPORATION,
<u>Defendant.</u>

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Cameron McGowan Currie, District Judge.
(CA-92-2543-2-22)

Argued: October 31, 1996

Decided: January 30, 1997

Before WILKINSON, Chief Judge, LUTTIG, Circuit Judge,
and BUTZNER, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion. Senior Judge Butzner
wrote an opinion concurring in part and dissenting in part.

_____

**COUNSEL**

**ARGUED:** Michael Douglas Block, BLOCK, KROCKEY, CERNU-GEL & COWGILL, P.C., Joliet, Illinois, for Appellants. Andrew Steven Halio, HALIO & HALIO, Charleston, South Carolina, for Appellees Fluor Daniel and FD Services; James C. Brennan, Trial Attorney, Torts Branch, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee United States. **ON BRIEF:** Wheeler M. Tillman, TILLMAN LAW FIRM, North Charleston, South Carolina, for Appellants. Frank W. Hunger, Assistant Attorney General, Margaret Seymour, United States Attorney, J. Patrick Glynn, Director, JoAnn J. Bordeaux, Deputy Director, David S. Fishback, Assistant Director, Torts Branch, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee United States.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellant-plaintiff Stephen Goewey appeals the dismissal for lack of subject matter jurisdiction of his claim against appellee-defendant United States (the "government"), and the summary judgment dismissal of his claim against appellees-defendants Fluor Daniel, Inc. and its subsidiary FD Services, Inc. (collectively,"FD"). We affirm.

I.

In 1989, Stephen Goewey, then one-year-old, lived with his parents, Julie and Kevin Goewey, in United States Naval housing owned by the government. The government employed FD as an independent contractor to provide maintenance and repair services for its Naval housing. In August of 1989, Julie Goewey notified the government

2

that her house had a foundation level water leak. In response, the government issued a work order to FD, which stated:"WATERPROOF ABOVE & BELOW GRND FOUNDATION LEAK." J.A. at 1485.

Consequently, on August 30, 1989, an FD employee reported to the Goewey home to repair the leak. The employee dug a trench down to the foundation of the house, and then applied roofing sealant to the exterior of the house, from approximately three feet below to several inches above the ground level of the house. On September 5, a second FD employee returned to touch up the work done by the first employee.

On September 12, 1989, Julie Goewey discovered her son sitting in a puddle of the roof sealant near the house, with his body covered with the sealant. Sometime thereafter, Goewey began experiencing difficulties with his motor coordination, and he was eventually diagnosed as having a severe neurological disorder.

Goewey, through his parents, filed suit against the government under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq., and against FD under state tort law, claiming that his neurological disorder was caused by his exposure to Triorthocresylphosphates ("TOCP"), a chemical that he alleges was in the roof sealant. The district court dismissed the suit against the government for lack of subject matter jurisdiction, and granted summary judgment in favor of FD on the issue of medical causation.

II.

The district court dismissed the suit against the government for lack of subject matter jurisdiction, concluding that Goewey's suit was barred by sovereign immunity. According to the district court, under the discretionary function and independent contractor exceptions to the FTCA, see Williams v. United States , 50 F.3d 299 (4th Cir. 1995), the FTCA did not provide a waiver of the government's sovereign immunity. Therefore, Goewey could not sue the government for what were the allegedly negligent acts of FD.

Finding no error in the district court's conclusion, we affirm the judgment of the district court.

3

III.

The district court also granted summary judgment in favor of FD on the issue of medical causation. Goewey's primary theory as to FD's liability was that his exposure to TOCP, which he alleges was present in the roof sealant, caused his neurological disorder. J.A. at 149. The district court excluded all of Goewey's expert witnesses on the TOCP theory, and also Goewey's key expert witnesses on non-TOCP theories, under Baughman v. American Tel. & Telegraph, 410 S.E. 2d 537 (S.C. 1991), and Daubert v. Merrill-Dow Pharmaceuticals, Inc., 113 S. Ct. 1786 (1993). The district court then granted summary judgment in favor of FD. We affirm.

Under South Carolina tort law, Goewey was required to present expert testimony that his theory of causation is more probably true than any other alternative theory of causation. Baughman, 410 S.E.2d at 543. Even if the proffered testimony is sufficient to satisfy Baughman, however, the district court may still exclude expert testimony if it finds that the testimony is unreliable. See United States v. Dorsey, 45 F.3d 809, 813 (4th Cir. 1995) (citing Daubert, 113 S. Ct. at 2794-95).

The district court first excluded the testimony of the three experts who testified in support of Goewey's TOCP theory of liability -- Drs. Robert K. Simon, M.D., Lorne K. Garretson, Ph.D., and Mohamed Abou-Donia, M.D. We have carefully reviewed the record, and we agree that the district court properly excluded this testimony.

No single one of Goewey's three witnesses could testify both that TOCP was present in the roof sealant, and that, if present, TOCP could cause Goewey's injury. One witness, Dr. Robert Simon, testified to the presence of TOCP, but could not testify to the causal connection between TOCP and Goewey's injury. See J.A. at 164, Appellant's Br. Reply at 15. Dr. Simon's own report, however, stated that his conclusions were "consistent with the presence of TOCP, but not confirmatory," J.A. at 1001, and that "the presence of interfering substances . . . ha[d] decreased [his] confidence in the result," J.A. at 1002. While Goewey's two other witnesses -- Drs. Garretson and Abou-Donia -- testified in support of the TOCP causation theory, neither had any knowledge of the presence of TOCP in the roof seal-

4

ant. And another of Goewey's expert witnesses, Dr. Peter Bernad, flatly rejected the TOCP causation theory. J.A. at 526.

All of the other evidence points to the absence of any TOCP in the roof sealant. The uncontradicted testimony of the manufacturer of the roof sealant is that "it does not currently use, and has never used, . . . TOCP in any of its formulations." J.A. at 1515. This is consistent with the Material Data Safety Sheet that accompanied the roof sealant here at issue, which did not list TOCP as a constituent of the sealant. Indeed, according to Dr. Garretson, TOCP is not ordinarily found in roof sealant, and so would have had to have been added to the roof sealant by FD's employees. J.A. at 279. FD's employees, however, denied adding anything to the sealant. J.A. at 620, 854, 857.

Given this, we cannot say that the district court abused its discretion in excluding this expert testimony as "not sufficiently reliable" under Daubert, J.A. at 164, see United States v. Powers, 59 F.3d 1460, 1471 (4th Cir. 1995), or that it erred in rejecting the expert testimony under Baughman. Accordingly, we affirm the district court's grant of summary judgment in favor of FD on the TOCP theory of medical causation.

As a secondary theory of liability, Goewey argues that chemicals other than TOCP, which were present in the roof sealant, caused his injury. In support of this argument, he relies on the testimony of three additional experts -- Drs. Peter Bernad, David Hartman, and Allan Lieberman. At the outset, we note that Goewey's primary theory of liability -- TOCP exposure -- is flatly inconsistent with this secondary theory of liability, and so, under Baughman , summary judgment in favor of FD is appropriate. Even assuming no such inconsistency, however, the district court's judgment was still appropriate.

The district court properly rejected the testimony of Drs. Bernad and Hartman under Daubert and Baughman as "insufficiently definite," "speculative," "conjectural," and "inconsistent." J.A. at 165-66. Both experts could only speculate as to what caused Goewey's injury; neither could point to a specific causative factor. Dr. Bernad, in what he characterized as his "best conclusion," could only state that "I cannot tell you what chemical, what material, whether in tar or asphalt, whether toulene, xylene, solvents, trichloroethylene, whether

5

an acute organophosphorus reaction, whether chronic and so-called organophosphorus-induced delayed neuropathy or any other disease state ensued. Unfortunately, none of us were there." J.A. at 514. The only specific theory that he offered, that Goewey suffocated on the roof sealant, J.A. at 515, is flatly contradicted by the evidence that Goewey's mouth had at most minimal contact with the roof sealant, J.A. at 686-87, 805, 1495, a fact of which Dr. Bernad was not aware, J.A. at 518. Similarly, Dr. Hartman, could state only that Goewey's injury was "caused by a neurotoxin related to his exposure to tar," J.A. at 1121, but he could not specify which neurotoxin caused the injury, J.A. at 1122. As his "personal favorite" explanation, Dr. Hartman could offer only a theory of "pyradine" exposure, J.A. at 1130, which the district court noted was supported by but "a handful of articles and [was] based on experimental studies injecting . . . a pyradine derivative into potatoes and mice," and thus could "not survive Daubert analysis," J.A. at 166.

Since the district court made no reference whatsoever to the testimony of Dr. Lieberman, we assume that this evidence was not excluded by the district court under Daubert or Baughman. Even so, the district court's grant of summary judgment was not in error. Dr. Lieberman testified that Goewey's injury was "most probably" caused by "an exposure of chlorinated hydrocarbons coming from asphalt and the possibility of contamination also with chlorinated hydrocarbons that were coming from pesticide which was in the soil," Lieberman Deposition at 16.[1] Although Dr. Lieberman's testimony is at times difficult to follow, he apparently believes that either toulene, a chemical in asphalt, or chlordane, a pesticide, caused Goewey's injury. J.A. at 486. Goewey has abandoned the theory that chlordane exposure caused his injury. See J.A. at 149 n.5. And regarding the asphalt theory of causation, we cannot say that the district court erred in granting summary judgment in favor of FD. Other than Dr. Lieberman's own assertions, we are unable to locate any evidence in the record to support this theory, and Goewey has pointed to none. Furthermore, at least two of Goewey's own experts have rejected the pos-

_____

[1] We note that although Dr. Lieberman considered himself an expert in neurology, he was board-certified only in pediatrics. J.A. at 476-77.

6

sibility that exposure to asphalt caused Goewey's injury. J.A. at 271-72 (Garretson), 530-31 (Bernad).**2**

Conclusion

For the reasons stated herein, we affirm the judgment of the district court.

AFFIRMED

BUTZNER, Senior Circuit Judge, concurring in part and dissenting in part:

I concur in the affirmance of the judgment dismissing the United States. I dissent from the summary judgment in favor of Fluor Daniel, Inc., and its subsidiary on the issue of medical causation. I am persuaded that Dr. Allan Lieberman's testimony is admissible and that it presents a genuine issue of material fact.

In Daubert v. Merrill Dow Pharmaceuticals, 509 U.S. 579 (1993), the Supreme Court restated the rules of admissibility of expert testimony. Previously in most circuits expert testimony was only admissible if it was based upon theories or techniques that had gained "general acceptance" in the relevant scientific field. Frye v. United States, 54 App. D.C. 46, 47, 293 F. 1013, 1014 (1923). Daubert held that the "austere standard" of the Frye test had been displaced by the Federal Rules of Evidence, Daubert, 509 U.S. at 589. Consequently, courts may admit expert testimony if it meets a two-prong test for

_____

**2** Goewey also argues that the district court erred in denying his motion to inspect the property on which he had been exposed to the roof sealant in order to collect a sample of the sealant. We disagree. As the district court noted, Goewey's failure to file this motion until two months after he learned that no current sample of the sealant existed, one month after the date that the district court had set as the cut-off date for discovery, and one week after the government and FD filed their motions to dismiss and for summary judgment, provided a sufficient basis to deny Goewey's motion. Alternatively, as the district court noted, any potential sampling of the roof sealant, taken now five years after Goewey's exposure to it, would be "inherently suspect," J.A. at 170.

7

reliability and relevance. Id. at 587. See generally United States v. Dorsey, 45 F.3d 809, 813-14 (4th Cir. 1996).

The tests for reliability and relevance derive from Rule 702 of the Federal Rules of Evidence. Rule 702 permits an expert to testify to any "scientific, technical or other specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue." An expert's testimony is reliable if it is based on "scientific knowledge"--a body of facts or inferences which are "grounded in the methods and procedures of science." Id. at 590.

With respect to the second prong, relevancy, the Supreme Court adopted the definition stated in Rule 401, which provides that relevant evidence is that which has "`any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' Rule 401. The Rules' basic standard of relevance thus is a liberal one." Id. at 587. Nevertheless, the testimony must not run afoul of Rule 403, which cautions against evidence that misleads the jury through unfair prejudice or confusion of the issues. Id. at 595. The substance of the expert's testimony "requires a valid scientific connection to the perti-nent inquiry as a precondition to admissibility." Id. at 591-92.

Daubert encourages courts to consider a variety of factors in assessing whether an expert's testimony is scientifically reliable and relevant. These factors include whether the expert's scientific theory or technique has been tested, peer-reviewed, or published, as well as its applicable rate of error. Id. at 593. Courts may also consider whether the scientific method meets Frye's standard of "general acceptance" in the particular scientific field. Id. at 594. Daubert, how-ever, emphasized that these factors should only provide general guid-ance to lower courts and should not serve as a definitive checklist that courts must follow. Id. at 593.

Dr. Lieberman's testimony satisfied Daubert's twin touchstones of reliability and relevance. Dr. Lieberman is a board certified pediatri-cian who practices occupational and environmental medicine. He also has extensive clinical experience in pediatric neurology. For five years, Dr. Lieberman served as medical director of the Vince Mosley Diagnostic and Evaluation Clinic of Charleston, South Carolina,

8

which is the center for the diagnosis of neurologically handicapped children. He was also medical director of the Coastal Rehabilitation Center in Charleston, a state institution which serves neurologically handicapped children and adults. He served as Chief of Pediatrics at the United States Naval Hospital in Charleston, South Carolina, and he was a lecturer in applied neuroanatomy at the Medical University of South Carolina. In addition to being board certified in pediatrics, he is a Fellow, American Academy of Environmental Medicine, and a Diplomat, American Board of Environmental Medicine. There can be no doubt that Dr. Lieberman was well qualified to testify about the neurological consequences of Stephen Goewey's exposure to the tar or asphalt that Fluor Daniel applied to the Goewey residence.

Dr. Lieberman's method of diagnosis was scientifically reliable. He diagnosed Stephen's condition using differential diagnosis. The Federal Judicial Center's Reference Manual on Scientific Evidence, 214 (West 1994), defines differential diagnosis as follows:

> The method by which a physician determines what disease process has caused a patient's symptoms. The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history.

See also Dorland's Illustrated Medical Dictionary 369 (6th Ed. 1985). Differential diagnosis is a well-recognized, reliable method of medical diagnosis that has gained "widespread acceptance" in the medical community. It has been subject to peer review and "does not frequently lead to incorrect results, it is a method that involves assessing causation with respect to a particular individual." In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 758 (3d Cir. 1994). Stephen was one of Dr. Lieberman's patients. Dr. Lieberman based his diagnosis on examinations, clinical tests, and a thorough case history. Dr. Lieberman's differential diagnosis satisfied Daubert's requirement that an expert's testimony must be reliable.

Dr. Lieberman's testimony also satisfies Daubert 's second requirement that an expert's testimony must be relevant. It is undisputed that Stephen was exposed to the tar that Fluor Daniel applied to the family residence. The evidence discloses that 80% of the child's body was

9

covered with tar. He had tar on his hands and under his fingernails. While his mother was trying unsuccessfully to wash the tar off, he kept putting his hands in his mouth with such frequency that a navy employee suggested that Stephen's mother should hold his hands down. His teeth were coated with tar, and the day after his initial exposure to the tar he still had tar on his teeth, fingernails, toenails, and eyebrows. Before exposure, he was a normal child. After exposure, he suffered severe neurological deficits.

Dr. Lieberman found biomarkers in Stephen for toluene, a neurotoxic petroleum solvent contained in tar or asphalt that can cause long-term toxicity. A urinalysis of Stephen at Duke University revealed high levels of hippuric acid, the major metabolite and biomarker for toluene. Though there was no evidence of toluene in Stephen's fat samples, Dr. Lieberman explained that he would not expect to see evidence of toluene 14 months after the incident in a substance as nonhomogeneous as fat. Evidence of toluene in fat would have confirmed the diagnosis, but the absence of such evidence did not rule out the presence of toluene. Specifically, the doctor reasoned: "[I] feel at this time that we do have biological markers of exposure with hippuric acid from the toluene and the sample taken at the Medical University for the oxychlordane [pesticide]. So I'm perfectly satisfied." (bracket added).

Dr. Lieberman explained in detail why he believed that Stephen was not suffering from genetic deficiencies. He testified that Stephen suffers from brain damage. With respect to causation, he concluded: "[T]he causation was most probably related to an exposure of chlorinated hydrocarbons coming from asphalt and the possibility of contamination also with chlorinated hydrocarbons that were coming from pesticide which was in the soil." In South Carolina, an expert testifying to causation must state that the data on which he bases his conclusion most probably caused the injury. Baughman v. American Tel. & Telegraph, 306 S.C. 101, 111, 410 S.E.2d 537, 543 (1991). Dr. Lieberman's expert testimony about the toluene in the tar satisfies South Carolina's "most probably" requirement of causation.

Fluor Daniel did not apply the pesticide. But Dr. Lieberman's opinion that the tar and the pesticide caused Stephen's injury does not preclude the admissibility of his testimony. Nor does it defeat Stephen's

10

claim. The Supreme Court of South Carolina recognizes concurring causes. In a passage that is clear and to the point, the Court wrote:

> When we speak of proximate cause, we are not referring to the "sole cause." In order to establish actionable negligence, the plaintiff is required only to prove that the negligence on the part of the defendant was at least one of the proximate, concurring causes of his injury. It is generally for the jury to say whether the defendant's negligence was a concurring, proximate cause of the plaintiff's injuries.

Hughes v. Children's Clinic, P. A., 269 S.C. 389, 398, 237 S.E.2d 753, 757 (1977).

Fluor Daniel emphasizes that plaintiff's experts disagree. But this does not compel dismissal of the plaintiff's case. Federal Rule of Civil Procedure 8 permits a plaintiff to state as many separate claims as the party has "regardless of consistency." The need to state multiple claims is particularly pressing in the discovery phase when a plaintiff needs to explore all possibilities in a case such as this. The need was aggravated because the government lost or misplaced the only sample of the tar that was taken shortly after Stephen's exposure. Fortunately the loss of the sample is not fatal. Stephen's urinalysis at Duke established the presence of a toxic constituent of tar or asphalt in his body. In any event, the Supreme Court has put Fluor Daniel's defense on this issue to rest. The Court has held that medical unanimity is not required among the plaintiff's experts for a jury to draw its own causal conclusions and that experts may testify that there was more than one potential cause of the plaintiff's injuries. Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 109 (1959); see also Hines v. Consolidated Rail Corp., 926 F.2d 262, 269 (3d Cir. 1991).

Summary judgment is appropriate only when there exists no genuine issue of material fact in dispute. Fed. R. Civ. P. 56(c). To survive summary judgment, a plaintiff must forecast sufficient evidence supporting his version of a disputed material fact so that a reasonable jury could return a verdict in his favor. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250. Anderson defines the sufficiency of the evidence standard as "whether the evidence presents a sufficient disagreement

11

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson</u>, 477 U.S. 242, 251.

The cause of Stephen's injury is, of course, a material fact. Stephen's evidence is sufficient to enable a reasonable jury to return a verdict in his favor.

The trial court has not yet ruled on the admissibility of the Fluor Daniel's experts' opinions, so it would be superfluous to analyze these opinions in detail. Suffice it to say that the substance of their testimony is that they do not know the cause of Stephen's condition, in their terms "etiology unknown."

Clearly there is a genuine issue of material fact that made summary judgment inappropriate. I respectfully dissent because Stephen is entitled to a jury trial.