UNITED STATES of America, Plaintiff–Appellee,

v.

Ernest BYNUM, Jr., Defendant–Appellant.

No. 92–5736.

United States Court of Appeals, Fourth Circuit.

Argued July 26, 1993.

Decided Sept. 1, 1993.

Jack Benjamin Crawley, Jr., Raleigh, NC, argued, for defendant-appellant.

Jane H. Jolly, Asst. U.S. Atty., Raleigh, NC, argued (James R. Dedrick, U.S. Atty., on brief), for plaintiff-appellee.

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

## OPINION

K.K. HALL, Circuit Judge:

Ernest Bynum appeals his convictions and sentence for possession of and conspiracy to possess crack cocaine with intent to distribute. We affirm.

### I.

In March, 1992, Ernest Bynum rented a Mercury Sable at LaGuardia Airport in New York and drove to Henderson, North Carolina, with his cousin, Raymond Walker. Authorities apparently were expecting him and knew his intentions, as they obtained search warrants for the Sable and for three rooms (112, 114, and 174) at the Holiday Inn in Henderson. On March 17, warrants in hand, federal agents and local officers set up surveillance at the Howard Johnson motel across the street from the Holiday Inn.

The Sable was parked at the Howard Johnson. Bynum came out of the motel, got in the car, drove it across the street to the Holiday Inn, and parked outside Room 174. Bynum went in the room carrying a bag. A few minutes later, he came back out of the room and sat in the driver's seat of the Sable. Shortly thereafter, another person, Louis Hodge, came out of the room and got into the car.

Raymond Walker approached the car and had a conversation with the occupants. Bynum began to drive away. Officers stopped the car, found 34.2 grams of crack on Hodge's body, and arrested Bynum and Hodge.

Meanwhile, other officers tried to execute the search warrant for Room 174. They knocked, but no one answered. They next tried a key, but the door was dead-bolted. Finally, Dale Greene opened the door. The officers heard the toilet running. With the assistance of the hotel janitor, officers retrieved 5.6 grams of crack, packed in a New-

port cigarette wrapper, from the toilet. Greene was arrested, and cocaine residue was found in a baggie in his pocket. A search of the room also uncovered a key chain with Bynum's New York address on it and a traffic ticket issued to Greene when he had driven Bynum's rented Sable.

Yet another team of officers spoke to Walker, who was not yet under arrest. Walker led the officers to, and consented to the search of, Room 229 of the Howard Johnson. In that room, officers found a blue suitcase with $5,000 in cash and, snapped to the suitcase, a pager that had been rented by Bynum. In the bathroom, 58.7 grams of crack were found in the tissue holder.

Bynum, Walker, and Greene were named in a four-count indictment, charging them with conspiracy to distribute crack and substantive offenses. Hodge, a juvenile, was charged in state court. Walker, Greene, and Hodge all pled guilty.[1] Walker and Hodge testified against Bynum at trial, but Greene refused. Bynum was found guilty of possession with intent to distribute and conspiracy. He was sentenced under the guidelines to 198 months.

Bynum appeals.

### II.

■ The government used three peremptory strikes, all of them against black jurors. Bynum, who is black, struck eleven jurors, ten of them white.[2] Both sides made equal protection challenges to the other's use of peremptories, and both were rejected. Bynum renews his challenge on appeal.

■ In *Swain v. Alabama,* 380 U.S. 202, 222–224, 85 S.Ct. 824, 837–838, 13 L.Ed.2d 759 (1965), the Supreme Court confirmed that race-motivated use of peremptory strikes by the prosecution violates the Equal Protection Clause of the Fourteenth Amendment. In recent years, the Court has expanded this rule so that it now has universal applicability. *Powers v. Ohio,* 499 U.S. 400, ——, 111 S.Ct. 1364, 1373, 113 L.Ed.2d 411

---

1. Walker's conviction was later set aside, without objection from the government, after the district court questioned the factual basis for his plea.

2. The petit jury finally seated had eight whites and four blacks.

(1991) (criminal defendant may challenge race-based use of peremptories whatever the defendant's own race); *Edmonson v. Leesville Concrete Co.,* — U.S. —, —– —, 111 S.Ct. 2077, 2081–2087, 114 L.Ed.2d 660 (1991) (applying rule to strikes by civil litigants); *Georgia v. McCollum,* — U.S. —, —– – —, 112 S.Ct. 2348, 2353–2359, 120 L.Ed.2d 33 (1992) (applying rule to strikes by criminal defendant). In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Court eased *Swain*'s "crippling" burden of proof and held that a defendant (and today any party) may establish a *prima facie* case of racial discrimination by inference from the circumstances (i.e. the pattern of use of peremptory strikes). Where a party's use of peremptories creates an inference that race is a factor, the trial court must inquire into the party's motives. If the party articulates a credible, race-neutral reason for its action, there is no equal protection violation. *Batson,* 476 U.S. at 98, 106 S.Ct. at 1724.

Here, the government offered explanations for all three of its strikes, and the district court accepted them as credible and race-neutral. One juror was struck because her last name was the same as someone the government's attorney had prosecuted from the same town. Another was struck because he was unemployed, had trouble arranging transportation to court, and had a nephew who used drugs. Finally, a young single mother was excluded because the government feared she would be too sympathetic to the defendant.

■ The district court, which can evaluate the government's candor from the live explanation, is much better positioned than we to enforce *Batson,* and, giving its factual finding "great deference," we review only for clear error. *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21; *United States v. Grandison,* 885 F.2d 143, 146 (4th Cir.1989), *cert. denied,* 495 U.S. 934, 110 S.Ct. 2178, 109 L.Ed.2d 507 (1990). The government's explanations are good enough to credit on a cold record. We see no clear error.

## III.

■ A witness' credibility may not be impeached by extrinsic evidence of specific instances of conduct. Fed.R.Evid. 608(b). The only exception is evidence of conviction of crime under Rule 609. A cross-examiner may inquire into specific incidents of conduct, but does so at the peril of not being able to rebut the witness' denials. The purpose of this rule is to prohibit things from getting too far afield—to prevent the proverbial trial within a trial.

A textbook Rule 608(b) situation happened here. Walker was asked by the defense on cross-examination whether he had ever sold crack cocaine. He denied it. The defense then wished to call a witness, Darwin Godbolt, to testify that Walker had sold cocaine in the Emporia, Virginia, area. The court did not allow the testimony.

Bynum contends that the prior act was admissible under Rule 404(b), and that 404(b) overrides 608(b). *See, e.g., United States v. Smith Grading and Paving, Inc.,* 760 F.2d 527 (4th Cir.), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 457 (1985). Other than asserting it, though, Bynum does not explain what Rule 404(b) purpose would have been served by the evidence. The district court's decision to exclude Godbolt's testimony was not an abuse of discretion.

## IV.

■ A principal goal of the government's case was tying Bynum together with his conspirators and the various amounts of seized crack. Accordingly, the government called two chemists to explain that they had conducted chromatographic analysis on samples taken from the three quantities of crack. A DEA expert opined that all three came from the same batch.[3] A state crime lab chemist agreed as to the 38.3 grams seized from Hodge and the 58.7 found in the Howard

---

**3.** A naturally derived product like cocaine has numerous impurities and byproducts of decomposition. The scientific theory underlying the expert's testimony in this case is that comparison of the precise mathematical proportions of the various impurities can show with a great degree of accuracy whether two samples of cocaine were manufactured together.

Johnson, but he stated that his test on the 5.6 grams found in the toilet was inconclusive. The testimony of these chemists was admitted over the defendant's objection.

After the trial, defense counsel read in the newspaper that Bynum's conviction was the first obtained under the new federal/state "Sniffer" program (i.e. chromatograph analysis of cocaine). In his brief on appeal, Bynum complained that the district court did not understand that the testimony involved "new" science and should have been evaluated under the *Frye*[4] standard. He did not, however, proffer any argument or evidence to show that gas chromatography is unreliable or not generally accepted in the scientific community.

█ In any event, while this appeal was pending, the Supreme Court held that Fed. R.Evid. 702 does not incorporate the "austere" *Frye* standard. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). If proffered expert testimony relies upon "scientific" knowledge and would assist the trier of fact in determining a fact in issue, the expert testimony is admissible under the rule. "Scientific" knowledge is generated through the scientific method—subjecting testable hypotheses to the crucible of experiment in an effort to disprove them. An opinion that defies testing, however defensible or deeply held, is not scientific. The *Daubert* Court did make clear, though, that district courts need not admit all "scientific" evidence without any regard for its reliability. Trial judges may consider whether the particular opinion or technique has been subjected to peer review, what the known rate of error of the technique is, and, recalling *Frye,* whether it enjoys "widespread acceptance" in the community. —— U.S. at ——, 113 S.Ct. at 2797. The Court emphasized that it was prescribing a "flexible" rule, one committed, as are most questions of admissibility of evidence, to the discretion of the district courts. *Id.*

Though it invoked *Frye,* the government's proffer of evidence could hardly have better anticipated *Daubert.* The government explained the hypotheses underlying the technique, listed the numerous publications through which the technique had been subjected to peer review, and concluded with a citation to authority that gas chromatography enjoys general acceptance in the field of forensic chemistry. The district court did not abuse its discretion by permitting the testimony.

## V.

█ After Bynum's trial, Greene, who had refused to testify for the government, came forward with "new" evidence. According to Greene, the 5.6 grams he flushed down the toilet had been purchased the day before in Louisburg, North Carolina. Bynum moved for a new trial on the ground that this evidence contradicted the chemists' testimony.[5] After hearing Greene's live testimony, the district court denied the motion. We review the district court's ruling for abuse of discretion. *United States v. Arrington,* 757 F.2d 1484, 1486 (4th Cir.1985).

Courts are justifiably leery of post-trial statements by codefendants purporting to exonerate a cohort. *Cf. United States v. Johnson,* 487 F.2d 1278, 1279 (4th Cir.1973) (post-trial recantations of trial testimony are " 'looked upon with utmost suspicion' " (quoting *United States v. Lewis,* 338 F.2d 137, 139 (6th Cir.1964))). Moreover, Greene's evidence did not go to the heart of the case—Bynum's guilt of conspiracy—but rather only to a small piece of the government's evidence. Even if the 5.6 grams was from a different batch, there was plentiful evidence that Greene possessed it as part of a conspiracy with Bynum. Greene got a ticket driving Bynum's rented Sable, and Bynum's key chain was found in Greene's room. Bynum had been seen entering and leaving Greene's room only moments before the search. It was helpful, but not crucial, to the government's case that the cocaine in the toilet was

---

**4.** *Frye v. United States,* 54 App. D.C. 46, 293 F. 1013 (1923).

**5.** Actually, Greene's testimony contradicted only one of the two chemists; the other said the analysis of the drugs retrieved from the toilet was inconclusive.

part of the same batch as the cocaine in the car and at the Howard Johnson. There was copious independent evidence of the conspiracy.

■ This circuit has a five-part test for evaluating motions for a new trial based on newly-discovered evidence. Under *United States v. Chavis,* 880 F.2d 788, 793 (4th Cir. 1989), a motion for a new trial should be granted only if (1) the evidence is newly discovered, (2) the movant exercised due diligence in discovering the evidence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to the issues, and (5) the evidence would probably result in an acquittal at a new trial. Greene's story utterly fails to satisfy two of the factors—it is not material, and it would not probably result in acquittal at a new trial. The district court's denial of a new trial was therefore not an abuse of discretion.

### VI.

■ Bynum challenges the district court's findings that he was responsible for 98.5 grams of crack and that he deserved a two-level enhancement for being a manager or supervisor of the criminal activity. Both factual findings are reviewed for clear error. *United States v. Daughtrey,* 874 F.2d 213, 217 (4th Cir.1989).

The drug weight finding is conservative and clearly correct: all 98.5 grams with which Bynum was charged were actually seized from his conspirators and about his belongings. The government did not attempt to attribute other amounts to Bynum by extrapolating from the large amount of cash on hand or from Hodge's testimony about other drug sales for Bynum. Likewise, the manager/supervisor enhancement was appropriate in light of Hodge's testimony that he sold crack for Bynum.

There are no clear errors in the factual findings at sentencing.

### VII.

■ This circuit has already decided that the 100-to-1 ratio the guidelines[6] ascribe as equivalent drug weights of crack and powder cocaine is rationally related to a legitimate government end, because crack is a greater threat to society. *United States v. Thomas,* 900 F.2d 37, 39–40 (4th Cir.1990). Likewise, several circuits have held that the alleged disparate impact this ratio has on blacks does not violate the equal protection component of the Fifth Amendment,[7] because the disparate impact of a facially neutral law does not render it unconstitutional unless the disparity "can be traced to a discriminatory purpose." *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979).

Bynum makes a subtle variation on the rejected equal protection argument. He concedes that the Sentencing Commission did not intend the disparate impact; therefore, he says, the Commission did not consider it, and the disparate impact on blacks is a ground for a downward departure. As a black, then, Bynum is entitled to the departure. A divided panel of the Eighth Circuit recently rejected this argument. *United States v. Lattimore,* 974 F.2d 971 (8th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993).

We will follow *Lattimore.* It is not enough to justify a downward departure to show simply that the departure is sought upon a factor not taken into account by the Commission. From the countless factors that constitute the human experience, the Commission necessarily considered only a few. Any defendant can identify something about himself that the guidelines do not address. Consequently, an asserted ground for departure must be not only one that the Commission did not adequately consider, but also one for which a sentence outside the guidelines "should result." 18 U.S.C. § 3553(b); *Unit-*

---

**6.** U.S.S.G. § 2D1.1; *see also* 21 U.S.C. § 841 (providing for certain mandatory minimum sentences using the same 100-to-1 ratio).

**7.** *See, e.g., United States v. Chandler,* 996 F.2d 917, 918 (7th Cir.1993); *United States v. Frazier,* 981 F.2d 92, 95 (3rd Cir.1992), *cert. denied,* ——

U.S. ——, 113 S.Ct. 1661, 123 L.Ed.2d 279 (1993); *United States v. Galloway,* 951 F.2d 64, 65–66 (5th Cir.1992); *United States v. Johnson,* 944 F.2d 396, 404 n. 7 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991).

*ed States v. Hummer,* 916 F.2d 186, 192 (4th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1608, 113 L.Ed.2d 670 (1991).

Here, rather than a mitigating circumstance personal to the defendant, the alleged ground for departure is based solely on membership in a class. If Bynum is entitled to the disparate impact departure, then every black person whose relevant conduct involves crack cocaine is similarly entitled. When "should" the guidelines' failure to address the impact of a provision on a class "result" in class-wide downward departures? We think that, bound as we are to respect the policy decisions of the coordinate branches of government, we can provide such extraordinary relief only when failure to provide it would deprive the class of equal protection. Thus, our foray through departure analysis brings us back to the question Bynum's argument meant to avoid: was the 100–to–1 crack-to-powder ratio, racially neutral on its face, enacted for the discriminatory purpose of punishing blacks more than whites for similarly culpable conduct? Bynum concedes that he has no evidence that it was. The judgment and sentence are affirmed.

*AFFIRMED.*

WIDENER, Circuit Judge, concurring:

I concur in the result.