ACCEPTED
01-13-00931-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
1/3/2015 11:04:00 AM
CHRISTOPHER PRINE
CLERK

## NO. 01-13-00931-CR

## IN THE COURT OF APPEALS
## FOR THE FIRST JUDICIAL DISTRICT OF TEXAS
## AT HOUSTON

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/5/2015 8:00:00 AM
CHRISTOPHER A. PRINE
Clerk

| | | |
|---|---|---|
| **MELISSA DROMGOOLE** | § | **APPELLANT** |
| | § | |
| **VS.** | § | |
| | § | |
| **THE STATE OF TEXAS** | § | **APPELLEE** |

_____

## APPEAL FROM CAUSE NO. 1840727
## IN THE COUNTY COURT AT LAW NO. 1
## OF HARRIS COUNTY, TEXAS

_____

## APPELLANT'S REPLY BRIEF

_____

**NORMAN J. SILVERMAN**
**Texas Bar No. 00792207**
**917 Franklin, 4th Floor**
**Houston, Texas 77002**
**(713) 526-1515**
**(713) 526-1798 (FAX)**
**lawyernorm@msn.com**
**ATTORNEY FOR APPELLANT**

# Contents

Table of Contents ..................................................................................................2

List of Authorities ................................................................................................3

Reply Regarding Issue One ....................................................................................6

Reply Regarding Issue Three ...............................................................................10

    A.    The error was preserved ...........................................................10

    B.    Appellant's proposed construction does not lead to absurd results; the analysis in *Beeman* is no long valid. .............................................13

Reply Regarding Issue Four ................................................................................17

    A.    Standard of Review .................................................................17

    B.    Applicable Law.......................................................................18

    C.    The State failed to establish by clear and convincing evidence that the blood serum analysis was reliable because the method was not properly validated. .................................................20

    D.    The error affected Appellant's substantial rights. .................................35

Prayer ..................................................................................................................37

Certificate of Service............................................................................................38

Certificate of Compliance ....................................................................................38

# List of Authorities

**Cases:**

*Beeman v. State,* 86 S.W.3d 613 (Tex. Crim. App. 2002) ...............................*passim*

*Bolieu v. State*, 779 S.W.2d 489 (Tex.App.-Austin 1989, no pet.) .........................20

*Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999) ........................................................27

*Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010) ..................................*passim*

*Combs v. State*, 6 S.W.3d 319
(Tex. App.-Houston [14th Dist.] 1999, no pet.) ................................................20

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ............................17, 21

*E.I. du Pont de Nemours & Co., Inc. v. Robinson*,
923 S.W.2d 549 (Tex. 1995) ..............................................................................34

*Ford v. State*, 305 S.W.3d 530 (Tex.Crim.App.2009) ............................................12

*Garcia v. State*, 829 S.W.2d 796 (Tex. Crim. App. 1992) ......................................15

*Jackson v. State*, 17 S.W.3d 664 (Tex. Crim. App. 2000) ......................................17

*Johnson v. State*, 967 S.W.2d 410 (Tex. Crim. App. 1998) ....................................36

*Jones v. State*, 716 S.W.2d 142 (Tex. App.-Austin 1986, pet. ref'd) .....................20

*Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992) ...................................19, 20

*King v. State*, 953 S.W.2d 266 (Tex. Crim. App. 1997) ..........................................36

*Lankston v. State*, 827 S.W.2d 907 (Tex. Crim. App. 1992) ...................................13

*Martinez v. State*, 17 S.W.3d 677 (Tex. Crim. App. 2000) .....................................36

*Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997) ......................21

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1991) .............................17

*Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir.1998) .............................24

*Prystash v. State*, 3 S.W.3d 522 (Tex. Crim. App. 1999) .......................................17

*Roberts v. State,* 940 S.W.2d 655 (Tex. Crim. App. 1996) .....................................15

*State v. Daugherty*, 931 S. W.2d 268 (Tex. Crim. App. 1996) ..............................16

*State v. Johnson*, 939 S.W.2d 586 (Tex. Crim. App. 1996) ...................................16

*State v. Johnston*, 336 S.W.3d 649 (Tex. Crim. App. 2011) ................................6, 7

*State v. Villarreal*,
    No. PD–0306–14, —— S.W.3d ——,
    2014 WL 6734178 (Tex. Crim. App. Nov. 26, 2014) ..................................14, 16

*United States v. Bynum*, 3 F.3d 769 (4th Cir. 1993) .............................................20

*Vela v. State*, 209 S.W.3d 128 (Tex. Crim. App. 2006) .........................................17

*Webb v. State*, 36 S.W.3d 164
    (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd) ............................................36

*Wright v. State*, 853 S.W.2d 154 (Tex. App.-Corpus Christi 1993, pet. ref'd) .......20

**Statutes, Codes and Constitutional Provisions:**

TEX. R. APP. P. 9.4 ...............................................................................................38

TEX. R. APP. P. 33.1 .............................................................................................12

TEX. R. APP. P. 44.2 .............................................................................................36

TEX. CODE CRIM. PROC. ANN. art. 38.22 (West 2005) ............................................17

TEX. CODE CRIM. PROC. ANN. art. 38.23 (West 2005) .....................................16, 17

TEX. R. EVID. 702 ....................................................................................................17

TEX. R. EVID. 705 ....................................................................................................18

TEX. TRANSP. CODE § 724.012 ............................................................................*passim*

TEX. TRANSP. CODE § 724.013 ............................................................................*passim*

**To the Honorable Justices of the Court of Appeals:**

## Reply Regarding Issue One

The State asserts that Appellant failed to meet her burden with regard to her claim that a blood test was unreasonable due to her medical condition, syncope. The State asserts that the law requires a defendant to explain to the police prior to the blood draw why the disclosed condition would render a blood test unreasonable (State's Brief at 8-11). This argument does not defeat her claim for four reasons.

First, this is not the standard set out in *State v. Johnston*, 336 S.W.3d 649, 659 (Tex. Crim. App. 2011), which requires only evidence in the record verifying a medical condition which renders a blood draw traumatic, painful, or risky. The Court of Criminal Appeals set out the standard for disclosure as follows:

> Implicit within *Schmerber* is that each suspect bears the burden of showing that a venipuncture blood draw is not a reasonable means to obtain a blood alcohol level assessment as to him or her, individually. And in the absence of any record evidence showing that a venipuncture blood draw would not be reasonable in a particular case due to a verifiable medical condition, we will presume that the choice to administer such a test is reasonable. A DWI suspect, naturally familiar with his or her own medical history, is in the best position to identify and disclose any peculiar medical condition that could result in risk, trauma, or more than de minimus pain if a blood draw were to be performed.

*Id.* at 660 (footnotes omitted). Nowhere in the *Johnston* opinion does the Court

require a defendant to fully explain to the police prior to the blood draw why a disclosed condition makes a blood draw traumatic, painful, or risky. The standard requires the defendant, in order to overcome the presumption of reasonableness, to establish **record evidence** verifying that the defendant has a medical condition that renders a blood draw traumatic, painful, or risky. Appellant met this burden.

Second, even if the trial court found that Appellant did not fully explain the specific risk concerning blood drawing to the police, what she disclosed about her condition was enough to put the police on notice that a blood draw should not be done without further investigation into her condition. The undisputed facts show that Appellant told Officer Nunn that she suffered from syncope, that it involved low blood pressure and fainting, and that she was suffering from an episode of her condition at the police station that caused her to be unable to get out of the patrol car for ten to fifteen minutes (SX4; 2RR65; 5RR81, 164; 9RR32, 79). These disclosures were sufficient to inform the police that a blood draw might result in complications, particularly in light of the fact that she was too ill to stand shortly before the blood draw. The Court in *Johnston* expressly entrusted law enforcement officials with the duty to be "deliberate and conscientious when choosing the type of test to administer to obtain a suspect's blood alcohol level." 336 S.W.3d at 660. When presented with a suspect who has identified a condition involving low blood

7

pressure and fainting, and who claims to a suffering from an episode while in custody, a conscientious officer would investigate the condition by further questioning the suspect about the condition, or by consulting a reference or medical professional, before subjecting the suspect to a forced invasive procedure. Placing an onerous burden on a suspect who is likely nervous, possibly incapacitated by a medical condition, possibly intoxicated, and facing the coercive circumstances of being confronted by the police with a court order for a forcible blood draw, to present a full explanation of how a particular medical condition may present complications in a blood draw or to request specific accommodations, is unreasonable. This is especially the case where the police have already ignored or discounted the suspect's claims of illness and accused her of being uncooperative.

Third, the evidence in this case shows that Officer Nunn did not believe Appellant when she disclosed her condition, so further explanation would have been futile. The State acknowledges that Officer Nunn did not believe Appellant when she claimed to be unable to exit the patrol car because of her syncope (State's Brief at 10-11; 2 RR67-68, 72, 73). Nunn also testified that it was his practice to disregard reported medical conditions as mere "excuses" and that he was wholly unaware of any conditions that could present complications in a blood draw (2RR28, 67, 76-77). Nunn continued to maintain at the suppression hearing that

8

Appellant was simply being uncooperative when she told numerous officers that she was ill and unable to exit the patrol car (2RR73). Nunn was clearly unreceptive to Appellant's attempts to apprise him of her condition, and there are apparently no police procedures in place for documenting or verifying reported medical conditions. For these reasons, placing a more onerous burden on Appellant and similarly situated defendants would serve no purpose.

Finally, allowing a defendant to demonstrate how a medical condition creates the risk of pain or trauma *after* the blood draw does not put the State in any worse position. Regardless of whether the defendant meets her burden before the blood draw or later in a hearing, the outcome is the same – no blood test evidence for the State. In the absence of clear language in *Johnston* imposing a deadline for meeting the burden to overcome the presumption of reasonableness, this Court should not impose an arbitrary deadline.

The Court should find that Appellant's disclosures to the police, in conjunction with the supporting expert testimony at the suppression hearing, were sufficient to fulfill her burden under *Johnston.*

## Reply Regarding Issue Three

**A. The error was preserved.**

The State asserts that Appellant failed to preserve her claim that sections 724.012 - 724.013 of the Transportation Code do not authorize a nonconsensual blood draw absent the aggravating circumstances listed in section 724.012 (b). The State asserts that Appellant failed to preserve the error because her motion did not mention section 724.013.

Appellant sufficiently preserved her claim by referencing section 724.012. As asserted in Appellant's motion (CR84), section 724.012(a) states that "one or more specimens of a person's breath or blood **may be taken** if the person is arrested and **at the request** of a peace officer having reasonable grounds to believe the person" has committed driving while intoxication or driving under the influence of alcohol by minor. TEX. TRANSP. CODE § 724.012 (a) (emphasis added). Section 724.012(b) sets out the only circumstances when police may "require" the taking of a specimen in the event that "the person refuses the officer's request to submit to the taking of a sample":

> A peace officer **shall require** the taking of a specimen of the person's breath or blood under any of the following circumstances if the officer arrests the person for an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle or a watercraft and **the person refuses the officer's request to submit to the**

**taking of a specimen voluntarily**:

TEX. TRANSP. CODE § 724.012 (b) (emphasis added). The subsection then lists certain aggravating circumstances, fully laid out in the motion, in which a nonconsensual blood draw is permitted (CR84): the intoxication offense caused an accident resulting in death or serious bodily injury (724.012(b)(1)); the offense occurred with a child passenger in the vehicle (724.012(b)(2)); or the arrestee has been previously convicted or placed on community supervision for certain intoxication offenses under Chapter 49 of the Penal Code (724.012(b)(3)). As asserted in the motion, a first-offense DWI is "conspicuously missing" from the exclusive list of circumstances in which police "shall require" a specimen after a refusal (CR85). The language chosen by the legislature in subsection (a) – that a specimen "may be taken . . . at the request of a peace officer" -- indicates that the suspect must agree to the request. In contrast, subsection (b) states that the officer "shall require" the taking of a specimen even if "the person refuses the officer's request" in the limited enumerated circumstances.

Section 724.013, while not cited in the motion, is redundant of the content of section 724.012 because it simply states the converse: "Except as provided by Section 724.012(b), a specimen may not be taken if a person refuses to submit to the taking of a specimen designated by a peace officer." Section 724.012 (b) already

11

establishes the exclusive list of circumstances in which the police may "require" a suspect to submit to a nonconsensual test. Section 724.013 merely reemphasizes that, except for the enumerated circumstances, a nonconsensual specimen may not be taken.

Appellant's motion also asserted that the Court of Criminal Appeals misconstrued § 724.012 as providing an expanded ability to seize blood notwithstanding the existence of a warrant in *Beeman v. State*, 86 S.W.3d 613 (Tex. Crim. App. 2002), and argued that section 724.012 limits the availability of nonconsensual blood seizures pursuant to warrant to those circumstances listed in the statute (CR85-86). These arguments were sufficient to inform the trial court of the basis of her motion.

To preserve error, a complaint must be "made to the trial court by a timely request, objection, or motion that ... state[s] the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). Regarding its specificity, the objection must simply be clear enough to provide the judge and the opposing party an opportunity to address and, if necessary, correct the purported error. *Ford v. State*, 305 S.W.3d 530, 533 (Tex.Crim.App.2009). "Straightforward communication in

plain English will always suffice." *Lankston v. State*, 827 S.W.2d 907 (Tex. Crim. App. 1992). "The standards of procedural default ... are not to be implemented by splitting hairs in the appellate courts. As regards specificity, all a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Id*. at 909.

The motion clearly asserted that section 724.012(b) sets out an exclusive list of the circumstances in which police may require a nonconsensual test. Because section 724.013 simply restates the content of section 724.012, the motion adequately preserved the error.

**B.     Appellant's proposed construction does not lead to absurd results; the analysis in *Beeman* is no long valid.**

Regarding the merits of Issue Three, the State asserts that Appellant's proposed construction is absurd because it results in "giving certain DWI suspects more protection than other criminal suspects," an interpretation rejected by the Court of Criminal Appeals in *Beeman v. State,* 86 S.W.3d 613, 616 (Tex. Crim. App. 2002).

Appellant asserts that the entire analysis in *Beeman* interpreting the implied consent scheme has been called into doubt. The *Beeman* Court's rejection of

Appellant's proposed interpretation was expressly premised on its finding that the purpose of section 724.012 (b) is to provide for warrantless nonconsensual blood draws:

> The implied consent law does just that—it implies a suspect's consent to a search in certain instances. This is important when there is no search warrant, since it is another method of conducting a constitutionally valid search. . . . The implied consent law expands on the State's search capabilities by providing a framework for drawing DWI suspects' blood in the absence of a search warrant. It gives officers an additional weapon in their investigative arsenal, enabling them to draw blood in certain limited circumstances even without a search warrant.

*Id.* at 615-616. The Court has since invalidated its interpretation. Implied consent that has been withdrawn or revoked is not a substitute for the voluntary consent required by the Fourth Amendment. *State v. Villarreal*, No. PD–0306–14, —— S.W.3d ——, 2014 WL 6734178 at *11 (Tex. Crim. App. Nov. 26, 2014). "[T]he provisions in the Transportation Code do not, taken by themselves, form a constitutionally valid alternative to the Fourth Amendment warrant requirement." *Id.* at *20.

Because a critical assumption in the *Beeman* Court's analysis has been invalidated, its interpretation of the scheme as a whole is no longer reliable. Sections 724.012 – 724.013 clearly provide for different handling of certain DWI

cases where aggravating circumstances are present, as opposed to first-offense, non-aggravated DWI cases. The *Beeman* Court assumed that this different handling allowed warrantless nonconsensual blood testing in aggravated cases, and thus found it "absurd" to suggest that the scheme would limit the ability of an investigating officer to obtain a search warrant in non-aggravated cases. Now that the Court acknowledges that a warrant (or exigent circumstances) is always required for nonconsensual testing, it is not absurd to conclude that the scheme serves to delineate circumstances in which a nonconsensual blood draw is permitted.

It seems unlikely that the legislature enacted sections 724.012 – 724.013 to simply define when police have the discretion, as opposed to a mandatory duty, to seek a warrant, as suggested by the State (State's Brief at 36). The word "warrant" does not even appear in those sections. The fact that section 724.013 is titled "Prohibition on Taking Specimen if Person Refuses; Exception" does not suggest that the legislature intended to reserve an unrestricted right to seek a warrant. Established rules of statutory construction generally require that, where an express exception exists in a statute, the statute must apply in all cases not excepted. *Roberts v. State*, 940 S.W.2d 655, 659 (Tex. Crim. App. 1996); *Garcia v. State*, 829

S.W.2d 796, 800 (Tex. Crim. App. 1992). The legislature created one exception to its "prohibition" – the enumerated circumstances in section 724.012 (b).

In fact, in *Villarreal* the Court acknowledged that *Beeman* was circumscribed in part, but noted that "[t]he holding in *Beeman*, that an officer may obtain a search warrant even where implied consent statutes would authorize an involuntary blood draw, remains good law." *Id.* at *20 & n.15. Notably, the Court did not reaffirm the analysis in *Beeman* on the issue of whether an officer may obtain a warrant even where implied consent statutes would *not* authorize an involuntary blood draw, as in the instant case.

Furthermore, there is nothing absurd in interpreting a Texas statute so as to provide more protection than the federal constitution, particularly in the area of the acquisition of evidence in criminal investigations. The Court of Criminal Appeals found that "there is nothing logically absurd" in Article 38.23 of the Texas Code of Criminal Procedure, despite that fact that it expands beyond the reach of the Fourth Amendment by providing protection against unlawful searches by private citizens. *State v. Johnson*, 939 S.W.2d 586, 588 (Tex. Crim. App. 1996). Texas is the only jurisdiction in the country to afford this protection. Likewise, Texas is the only state in which the legislature has provided more protection to criminal defendants by rejecting the inevitable discovery exception to the exclusionary rule. *State v.*

*Daugherty*, 931 S. W.2d 268, 269-70 (Tex. Crim. App. 1996). Texas statutes provide more protection than the federal constitution provides by permitting both judge and jury to pass upon the admissibility of evidence when a claim is made that it was obtained "in violation of the law." TEX. CODE CRIM. PROC. ANN. arts. 38.22, 38.23 (West 2005). And the Texas legislature has enacted more stringent rules on the admissibility of confessions than those imposed by the federal constitution. TEX. CODE CRIM. PROC. ANN. arts. 38.22 (West 2005). In a state where the legislature has demonstrated a commitment to provide greater privacy rights for criminal suspects, there can be no argument that doing so is absurd.

## Reply Regarding Issue Four:

The State asserts that Appellant has inadequately briefed this issue by failing to include record citations. Records citations for the facts relevant to this issue were provided in the statement of facts section titled "Evidence Concerning the Reliability of the Blood Specimen Analysis," but to further assist the Court, this section of the brief is reproduced below, supplemented with records citations.

### A. Standard of Review

An appellate court reviewing a trial court's ruling on the admissibility of evidence must utilize an abuse of discretion standard of review. *Prystash v. State*, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999). The appellate court must uphold the trial

court's ruling if it was within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991).

## B. Applicable Law

Before admitting expert testimony under Texas Rule of Evidence rule 702, the trial court should determine that the expert is qualified, the opinion is reliable, and the evidence is relevant. See TEX.R. EVID. 702; *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006); *Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000). The trial court must be satisfied that three conditions are met before admitting expert testimony: (1) the witness's knowledge, skill, experience, training, or education must qualify him as an expert on a particular subject matter; (2) the subject matter that forms the basis of a witness's testimony must be based on a valid scientific theory and on a valid technique that has been properly applied on the occasion in question; and (3) the expert testimony will assist the factfinder in deciding the case. *Vela*, 209 S.W.3d at 131, 133. If the underlying facts or data do not provide a sufficient basis for the expert's opinion, the opinion is inadmissible. TEX.R. EVID. 705(c); *Vela*, 209 S.W.3d at 131–35.

In *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589-90, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court held that when the subject of the expert's testimony is "scientific knowledge," the basis of his

18

testimony must be grounded in the accepted methods and procedures of science. The Texas Court of Criminal Appeals adopted several procedural and substantive limitations upon the admission of expert scientific testimony to ensure that unreliable expert testimony is excluded from the jury's consideration. *Coble v. State*, 330 S.W.3d 253, 273 (Tex. Crim. App. 2010); *Kelly v. State*, 824 S.W.2d 568, 572–73 (Tex. Crim. App. 1992). Before scientific evidence may be admitted, the trial court must conduct a hearing outside the presence of the jury to determine whether the proponent has established its reliability. *Jackson,* 17 S.W.3d at 670. In order for scientific evidence to be reliable, "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Vela*, 209 S.W.3d at 133 (quoting *Kelly*, 824 S.W.2d at 573). The trial court's essential gatekeeping role is to ensure that evidence that is unreliable because it lacks a basis in sound scientific methodology is not admitted. *Id.* For expert testimony to be admissible under this rule, the party offering scientific expert testimony must demonstrate by clear and convincing evidence that this testimony is sufficiently reliable and relevant to assist the factfinder in reaching accurate results. *Kelly*, 824 S.W.2d at 572.

In *Kelly*, the Court of Criminal Appeals set out the following list of

nonexclusive factors that a trial court can consider in determining scientific reliability: (1) the extent to which the underlying theory and technique are accepted as valid by the relevant scientific community; (2) the qualifications of the testifying expert; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential error rate; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique in this case. *Kelly*, 824 S.W.2d at 573; *Coble*, 330 S.W.3d at 273 n. 40.

### C. The State failed to establish by clear and convincing evidence that the blood serum analysis was reliable because the method was not properly validated.

Texas and federal courts have found the gas chromatography test to be a generally reliable method for identifying compounds, and it has been generally accepted in the scientific community. *See Combs v. State*, 6 S.W.3d 319, 322 (Tex. App.-Houston [14th Dist.] 1999, no pet.); *Jones v. State*, 716 S.W.2d 142, 147 (Tex. App.-Austin 1986, pet. ref'd); *Wright v. State*, 853 S.W.2d 154, 155 (Tex. App.-Corpus Christi 1993, pet. ref'd); *United States v. Bynum*, 3 F.3d 769, 772 (4th Cir. 1993); *Bolieu v. State*, 779 S.W.2d 489, 490 (Tex.App.-Austin 1989, no pet.). Appellant does not challenge the underlying science of gas chromatography. The

20

issue in this case is whether testimony regarding blood serum analysis is sufficiently reliable where the validation study supporting the method was conducted under different parameters.

In *Daubert*, the United States Supreme Court held that "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." 509 U.S. 579, 589-90, 113 S.Ct. 2786. "Proposed testimony must be supported by appropriate validation." *Id.,* 509 U.S. at 590. Expert testimony is unreliable if it is based on unreliable data, or if the expert draws conclusions from his underlying data "based on flawed methodology." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997).

The following facts are not in dispute. The internal operating standards of the HPD Crime Lab and the standards of its accrediting agency require a method to be properly validated before the method is used for analysis of forensic evidence (6RR129; 7RR14; 19-20, 61). A validation study was conducted several months prior to the analysis of Appellant's specimen (7RR14). The validation study was necessary after the crime lab replaced the capillary columns of the headspace chromatograph (7RR108-109, 140; 8RR159-160). The purpose of a validation study is to demonstrate that a particular instrument at specific parameters will produce scientifically reliable results (7RR172-73). Accordingly, parameters may

be manipulated while a method is being developed but should remain fixed during the validation study (8RR172-173).

HPD Criminalist Laura Mayor, who conducted the validation study and the analysis of Appellant's specimen, acknowledged that the bulk of the study, comprising all of the critical components of the study, was conducted with the vial oven set at 60 degrees Celsius (6RR131; 7RR26-37, 57-59; DX20). This parameter was changed to 70 degrees on the fourth and final day of the study, where it remained for subsequent forensic casework, including the analysis of Appellant's sample (DX20; DX21; 6RR131; 7RR26-37, 58). The validation report stated that the study was conducted at the 70-degree setting, even though the portions of the study conducted at 60 degrees were not subsequently repeated after the change to 70 degrees (DX20; DX21).

Defense expert Amanda Culbertson testified that industry standards do not allow changing parameters without revalidation; accordingly, the method was not validated and the results were not valid or reliable (7RR158, 166, 176-177). At issue is whether the State nevertheless established by clear and convincing evidence that revalidation was not necessary and that the method used to analyze Appellant's specimen was reliable. This issue will be analyzed in light of the *Kelly* factors relevant to this inquiry.

**(1) The extent to which the underlying theory and technique are accepted as valid by the relevant scientific community.**

The science underlying headspace gas chromatography is generally accepted as valid in the scientific community. But the State failed to establish any general acceptance of the the practice of analyzing forensic evidence while deviating from validated parameters. None of the State's experts were able to identify any study, reference, or authority that sanctioned deviating from validated parameters in forensic analysis (7RR91; 8RR129-130); in fact, both Mayor and Arnold testified that parameters should remain fixed during method validation and all forensic analysis conducted pursuant to that method (6RR148-49; 8RR172-73).

None of the State's experts were able to identify any accepted or established criteria, standards, or principles governing whether a change in parameters necessitates revalidation. For example, the State presented no evidence of any general acceptance of Arnold's opinion that revalidation is not necessary in the absence of empirical data indicating that a parameter change impacted the instrument's performance.

Moreover, the State's experts each relied solely upon the results produced by the instrument from analysis performed after and independent of the validation study as demonstrating the reliability and accuracy of the instrument at the 70-degree setting. Neither Mayor nor Arnold presented any evidence indicating general

acceptance of the practice of relying on post-validation analysis of controls and calibrators, in lieu of a proper validation, to demonstrate the reliability of an instrument or method.

"[T]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable." *Moore v. Ashland Chemical, Inc*., 151 F.3d 269, 276 (5th Cir.1998). "This requires some objective, independent validation of the expert's methodology. The expert's assurances that he has utilized generally accepted scientific methodology is insufficient." *Id.* In the field of gas chromatography, the scientific method requires a properly conducted, fully documented validation study, as set forth in the internal operating standards of the HPD Crime Lab and the standards of its accrediting agency (7RR20-21; 8RR158-59). But the State presented only the experts' assurances that the deviation from the validated parameters did not affect the reliability of the forensic analysis. Lab Assistant Director Arnold testified that method deviation required documentation and supervisor clearance, but also testified that an analyst has discretion to determine whether a particular deviation required clearance and documentation (8RR149). Criminalist Mayor testified that she "must have had permission" to change the parameter (7RR53), but there was no evidence that the change had been

documented (7RR145-146). The State failed to demonstrate that anything other than standardless discretion governed the lab's practice of deviating from reported validation parameters.

"[U]nder the regime of *Daubert* a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Coble v. State*, 330 S.W.3d 253, 277 (Tex. Crim. App. 2010), quoting *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). Because the State's experts failed to identify any source demonstrating general acceptance of or any governing criteria for deviation from validated parameters, their opinions amount to unscientific speculation and do not meet the clear and convincing standard of reliability.

There was no evidence showing any general acceptance of the practice of changing parameters without revalidation so as to contradict the defense expert's testimony that this practice violated industry standard.

### (2) The existence of literature supporting or rejecting the underlying scientific theory and technique.

None of the State's expert witnesses identified any books, articles, or journals that shed any light on the propriety of changing parameters without revalidation. No objective source material was identified that would authorize deviations from validated parameters in casework analysis. No objective source

25

material was identified that would establish criteria for determining whether a parameter change required revalidation. No objective source material was identified that would authorize the use of calibrators and controls, in lieu of proper validation, to demonstrate the instrument's reliability. The State presented no evidence of any literature supporting Arnold's opinion that revalidation is not necessary in the absence of empirical data indicating that a parameter change impacted the instrument's performance.

According to the HPD Quality Assurance Manual, all technical procedures must be properly validated (8RR158-59); deviations from methods must be justified and documented (8RR149); and use of non-standard methods must be approved by a supervisor (8RR149). Yet Mayor could not recall the circumstances of the temperature change, and neither Mayor nor Arnold could identify documentation showing justification or supervisor approval for the change (7RR53). Thus, the lab's practices departed from the standards described in the one and only published resource brought to the court's attention with regard to method deviation.

### (3) The qualifications of the testifying experts.

Criminalist Mayor earned a bachelor's degree in forensic chemistry and a master's degree forensic science, and had two years' experience analyzing blood samples in the HPD Crime Lab (6RR73-74). But the evidence showed that the

26

questionable validation study was the first she had conducted (7RR21), and her testimony demonstrated many gaps in her knowledge of the subject matter. Mayor admitted that she did not know whether the lab's accrediting agency permitted any deviation from validated parameters in analyzing forensic evidence (7RR90); whether there were any studies or theories permitting deviation from validated parameters (7RR91; 8RR129-30); and whether every volatile would respond similarly to an increase in temperature (7RR74).

Assistant Director Arnold's educational background was not specific to forensic science but included bachelor's degrees in biology, biochemistry, and medical technology (7RR105). Arnold had almost 20 years' experience working in crime laboratories and served as an auditor for a laboratory accrediting board.[1] Despite these qualifications and credentials, Arnold was unable to identify any independent objective source material establishing standards or criteria for evaluating whether a parameter change required revalidation. "Although expert opinion testimony often provides valuable evidence in a case, 'it is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere ipse dixit of a credentialed witness.'" *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex.

[1] 8RR138-140.

27

1999). Arnold's assurances that the deviation did not affect the reliability of the analysis are mere ipse dixit, unsupported by any objective, independent basis.

### (4) The potential error rate.

None of the State's expert witnesses was able to identify or quantify the effect of a 60-to-70-degree vial oven temperature change on the instrument's performance. Mayor acknowledged that the increase in temperature increased the instrument's sensitivity, resulting in nearly double area counts for volatiles (7RR66-70), but she did not know if every volatile would respond similarly to a temperature increase (7RR74). Mayor admitted that the temperature change could affect the instrument's performance with regard to the limit of detection (7RR95).

Arnold testified that, based simply upon his experience, he would not expect the temperature change to have any impact on analytical results (8RR147). But this opinion was not substantiated by any reference or independent, objective source, and did not rise to the level of establishing a demonstrable error rate.

### (5) The availability of other experts to test and evaluate the technique.

The State presented no evidence that other experts were available to evaluate the practice challenged here, conducting forensic analysis at a 70-degree vial oven temperature when the essential components of the validation study were conducted at a 60-degree setting. It would seem that this practice cannot be adequately tested

and evaluated by other experts because a validation study is specific to a particular instrument. The State's experts acknowledged that each headspace gas chromatograph performs differently and that the purpose of a validation study is to demonstrate that a particular instrument performs reliably at specific parameters (7RR13, 110). Accordingly, access to the specific instrument is necessary to reliably test and evaluate the practice of deviating from certain parameters.

Moreover, Arnold testified that the use of fixed parameters is necessary so that other scientists can replicate scientific work (8RR173). This principle, a cornerstone of the scientific method, is wholly incompatible with the lab's practices of reporting certain fixed parameters in validation study documentation when different parameters were used for the critical parts of the study, and allowing analysts standardless discretion to deviate from validated parameters in conducting forensic analysis.

## (6) The clarity with which the underlying scientific theory and technique can be explained to the court.

The testimony of State's experts was rife with contradiction regarding the propriety of changing parameters without revalidation.

Both experts acknowledged that the standards of the lab and its accrediting agency required all forensic analysis to be conducted in accordance with validated methods (7RR20-21; 8RR158-59). Mayor testified that no test results may be

reported without a validated method in place (6RR129; 7RR14, 19-20, 61). Mayor testified that the use of calibrators and controls in conjunction with forensic analysis was not a substitute for proper method validation (7RR62). Yet both Mayor and Arnold relied solely on the instrument's results from runs conducted subsequent to and independent of the validation study to demonstrate the instrument's reliability at the unvalidated 70-degree setting.

The evidence showed that the critical components of the validation study – linearity, precision, limit of detection, and limit of quantification -- were conducted at the 60-degree setting (7RR57-59). Only on the fourth and final day of the study was the temperature changed to 70 degrees (6RR131; 7RR26-37, 58, DX20). The only portion of the study conducted at 70 degrees was a non-essential component recently added to the validation template to demonstrate that the presence of other volatiles would not interfere with the quantification of ethanol (7RR58, 115-16). Mayor and Arnold testified that linearity is established by running a calibration curve, and that linearity must be established before any other validation criteria may be studied (7RR26-29; 114). But no calibrators were run on the fourth day of the study at the 70-degree setting (8RR92), and no study components were conducted at 70 degrees to demonstrate precision, limit of detection, or limit of quantification (7RR57-59). The State presented no evidence showing proper validation of the

method at 70 degrees.

Accordingly, the State's experts were forced to resort to an ad hoc review of the results produced by the instrument during subsequent forensic casework to assess whether the parameter change had impacted the instrument's performance. Arnold testified that the method "has proven itself in the course of the year that it was in place."[2] Defense expert Amanda Culbertson explained the fallacy of this notion: validation is a condition precedent to expressing the results of any control or sample; otherwise, there would be no need for validation studies (7RR156, 168). Neither Mayor nor Arnold provided a coherent explanation of the purpose of a validation study if the reliability of the instrument can be demonstrated solely through the use of calibrators and controls in conjunction with forensic analysis.

Both Arnold and Mayor agreed that parameters may be manipulated during method development but should remain fixed for the duration of the validation study (6RR148-49; 8RR158-59). Accordingly, the first page of the validation report identified the specific parameters purported to have been validated by the study (DX20). Arnold's opinion that reliability may be assumed in the *absence* of empirical evidence of any impact caused by the deviation (7RR135; 150) is irreconcilable with the industry's requirement that reliability must be affirmatively

---

2  8RR150.

demonstrated at fixed parameters by a validation study.

Mayor testified that volatiles would respond proportionately to a temperature increase, but later testified that she did not know whether every volatile would respond similarly to an increase in temperature (7RR59-60, 68-69, 74).

Neither Mayor nor Arnold explained with sufficient clarity why a specific vial oven temperature was included among the fixed parameters in the study report if the temperature setting was irrelevant to the instrument's performance and identical results could be obtained at a range of temperatures.

Arnold acknowledged that a 10-degree vial oven temperature change would constitute an "analytical change," and also testified that any analytical change would require revalidation (7RR145-46). Yet Arnold testified that revalidation was not necessary in the absence of empirical data showing that the deviation impacted analytical results (7RR135, 150).

Neither Arnold nor Mayor sufficiently explained the distinction between a "significant" or "substantial" parameter change that would necessitate revalidation, versus an insignificant change that would not. Neither offered any criteria governing an analyst's discretion to deviate from validated parameters. Neither offered any standards governing whether a deviation required supervisor approval and documentation.

In sum, the testimony of the State's witnesses provided few, if any, definitive answers regarding the practice of deviating from validated parameters. The only substance that may be distilled from the oblique testimony of the State's experts is that a proper validation study is required, except when it is not; a validation study must be conducted at fixed parameters but sometimes parameters may be changed; the use of calibrators and controls in conjunction with forensic analysis is not a substitute for proper validation, except when it is; and a parameter change requires justification and documentation, except when it does not. This vacillation and self-contradiction cannot supply clear and convincing evidence that a scientific technique is sound. An intelligible explanation, at the very least, is required where a crime lab is found to have made a false or inaccurate entry in its method validation documentation in conjunction with an apparent deviation from its own internal operating procedures and the standards of its accrediting agency.

The lab employees' assurances that the forensic analysis was nevertheless reliable are nothing more than ipse dixit. It might seem like common sense that method parameters may be changed as long as there is no evidence of any impact, but common sense is no substitute for the scientific method in hard science fields such as analytical chemistry. An expert's assurances that he has utilized generally accepted scientific methodology are insufficient in the absence of objective,

independent validation of the expert's methodology. "Scientific evidence which is not grounded 'in the methods and procedures of science' is no more than 'subjective belief or unsupported speculation.'" *Coble,* at 280, quoting *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995).

In *Coble,* the Court of Criminal Appeals evaluated the reliability of the testimony of a forensic psychiatrist, Dr. Coons, on the issue of future dangerousness in a capital murder trial. The Court found that the Dr. Coons was a genuine forensic psychiatrist with ample qualifications, but that his methods were not supported by any objective source such as books, journals, or articles. 330 S.W.3d at 277. Without any independent validation of his methods, Dr. Coons' testimony was mere ipse dixit. *Id.* His reliance upon common-sense factors in his analysis was no substitute for showing that the method was generally accepted and empirically validated by other scientists. *Id.* The Court concluded that Dr. Coons' testimony did not meet the clear and convincing standard for reliability, even under the more flexible standards for "soft sciences," and that the trial court abused its discretion in admitting it.

The same deficiencies are present here. None of the State's experts identified any independent, objective source supporting their assurances that the parameter deviation did not require revalidation. This deficiency alone renders their testimony

34

unreliable. But there are other problems as well. The experts offered no satisfying explanation for errors/inaccuracies in the validation documentation. The experts failed to identify any standards governing an analyst's discretion to deviate from validated methods. This standardless discretion is no different from the "idiosyncratic" method employed by Dr. Coons in *Coble.* 330 S.W. 3d at 277. If this type of unsupported methodology is inadequate in soft sciences, it certainly has no place in hard science fields such as forensic chemistry.

More importantly, the experts' reliance on non-validated results to demonstrate the instrument's reliability is wholly irreconcilable with the principle that a validated method is a condition precedent to expressing results of any kind. If the testimony is this case is sufficiently reliable, then the industry-standard requirements of validation and maintaining validation documentation are nothing but mere formalities which may be disregarded as long as a lab employee testifies that a method "has proven itself" by virtue of casework analysis.

Accordingly, the State failed to demonstrate by clear and convincing evidence the reliability of the technique applied as required for a hard science, particularly one dependent upon the proper functioning of complex instruments. The trial court abused its discretion in admitting the expert testimony concerning that blood specimen analysis.

**D. The error affected Appellant's substantial rights.**

The harm standard for non-constitutional error is found in Texas Rule of Appellate Procedure 44.2(b). *Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000). A substantial right is affected, requiring reversal pursuant to Rule 44.2(b), when the error had a substantial and injurious effect or influence on the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). If the error had no influence or only a slight influence on the verdict, it is harmless. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). If it is unclear whether the error affected the outcome, the court should treat it as harmful. *Webb v. State*, 36 S.W.3d 164, 182 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd).

The blood specimen analysis testimony likely had a substantial effect on the jury's verdict. The jury was instructed on the per se theory of intoxication based on alcohol concentration of 0.08 or more (CR115). During deliberations, the jury specifically requested the "chomatographs" as well as the video of the blood draw.[3] Additionally, the other evidence of intoxication, Appellant's performance on the field sobriety tests, was called into question in light of Appellant's chronic medical condition, syncope. The evidence is undisputed that Appellant reported suffering from an episode of this condition while in police custody, shortly after she had

---

3 CR119.

performed the sobriety tests, to the extent that she was unable to move or stand up (2RR65; 5RR81, 164; 9RR32, 79). Appellant's physician testified that Appellant's lack of balance depicted on the scene video resembled a syncope episode because her balance suffered after a change of position and improved after time to equilibrate (2RR122). In light of the plausible innocent explanation for Appellant's performance on the sobriety tests, the expert testimony that Appellant's BAC was substantially above the legal limit had more than a slight influence on the verdict, and Appellant's conviction must be reversed.

## PRAYER

Appellant respectfully requests that the Court reverse her conviction and remand for a new trial.

Respectfully submitted,


/s/ NORMAN J. SILVERMAN
Texas Bar No. 00792207
917 Franklin, 4th Floor
Houston, Texas 77002
(713) 526-1515
(713) 526-1798 (FAX)
lawyernorm@msn.com

ATTORNEY FOR APPELLANT

# CERTIFICATE OF SERVICE

This document has been electronically served on the following parties contemporaneously and in conjunction with e-filing on January 5, 2015.

CARLY DESSAUER
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 755-5826
dessauer_carly@dao.hctx.net
curry_alan@dao.hctx.net

/s/ Norman J. Silverman

# CERTIFICATE OF COMPLIANCE

This document has been prepared with Microsoft Word 2010, and the sections covered by Texas Rule of Appellate Procedure 9.4(i)(1) contain 6,989 words according to the program's word-count function.

/s/ Norman J. Silverman